UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
John Doe, a fictitious name,                                          :
                                                                     :
                                                                     :   **ANSWER**
                                                                     :
                          Plaintiff,                                 :   09 CV 3650 (WHP)
                                                                     :
     -against-                                                       :
                                                                     :
The Salvation Army USA, The Salvation Army Greater New               :
York Division, Dr. Deborah Rose, Major Hodgson, Major                :
Klemanski, Ms. Erin Padula, Mr. Glenn Fisher, Mr. Leon               :
Linnen and Mr. Rodney Williams                                       :
                                                                     :
                          Defendant.                                 :
------------------------------------------------------------------------x

Defendants The Salvation Army, Deborah Rose, John Hodgson, Henrietta Klemanski,

Erin Padula, Glenn Fisher, Leon Linnen and Rodney Williams, by their attorneys, Tratner,

Molloy & Goodstein, LLP, and for their answer to the Complaint states as follows:

1.     Deny the allegations set forth in paragraph "1, " particularly that any damages

were caused by the defendants.

2.     Deny the allegations set forth in paragraph "2," particularly that any damages were

caused by the defendants.

3.     Deny knowledge or information to form a belief as to the truth or falsity of the

allegations contained in paragraph "3;" defendants did not perceive or know that plaintiff had

Acquired Immunodeficiency Syndrome. Deny that defendants ever learned during the course of

plaintiff's employment that plaintiff had Acquired Immunodeficiency Syndrome. Deny

knowledge or information to form a belief as to the truth or falsity of the allegations contained in

paragraph "3" that defendant is "homosexual." Deny that defendants ever perceived and/or

learned during the course of plaintiff's employment that defendant was or was not "homosexual."

Deny that defendant harassed, discriminated against, retaliated against and/or terminated plaintiff

because he had Acquired Immunodeficiency Syndrome and/or because of any known or

1

perceived sexual orientation.  Deny all other allegations in paragraph 3 of the complaint.

## JURISDICTION AND VENUE

4.      Admit the allegations set forth in paragraph 4 in that this Court has jurisdiction over the claims stated under 28 USC 1331.  Deny knowledge or information to form a belief as to the truth or falsity of the allegation that the state and city claims are "so related to the federal ADA claim...derive from a common nucleus of operative fact."

5.      Admit the allegations set forth in paragraph 5 in that venue is proper in the Southern District of New York.

## PARTIES

6.      Deny knowledge or information to form a belief as to the truth or falsity of the allegations contained in paragraph "6," particularly whether the plaintiff has a disability and requests proof of same and defendants reserve their right to move to dismiss in the event plaintiff does not have a disability.  Defendants never received a copy of the "Exhibit A, under seal" and only know the identity of the plaintiff based on plaintiff's counsel's oral representations.

7.      Admit the allegations contained in paragraph "7" and if the plaintiff is who his counsel represents him to be, that person was employed by The Salvation Army from October, 2001 until he was terminated because he abandoned his shift on December 20, 2006.

8.      Admit the allegations of paragraph "8" to the extent that defendant The Salvation Army is a not-for-profit religious corporation filed May 12, 1899 in accordance with the laws of the State of New York with an agent for service of process at 120 West 14th Street, NYC 10011.

9.      Deny the allegations of paragraph "9" however admit that The Salvation Army has New York Division offices located at 120 West. 14th Street, NYC.

10.  Deny the allegations of paragraph "10" in that the East Village Group Home is a Hard to Place Facility" which is strictly supervised by New York City Administration for Children's Services ("ACS") regarding staff/residence ratio requirements; and in that the teenagers placed in this home are not placed in this particular group home until they have

2

been rejected by at least six other placements. Admit that plaintiff worked at the East Village

Group Home from October 2001 to December, 2006. As of October 2004, plaintiff was Unit

Supervisor which made him responsible to maintain appropriate staff/residence coverage at the

Residence. Admit that the former address of the Group Home was 1 East Third Street, NYC.

11.     Admit the allegations contained in paragraph 11 in that The Salvation Army was

the employer of plaintiff.

12.     Deny the allegations contained in paragraph 12 as to the proper title for Deborah

Rose.

13.     Deny the allegation contained in paragraph 13 as to the proper title for Major

John Hodgson, an ordained minister.

14.     Deny the allegation contained in paragraph 14 as to the proper title for Lt. Col.

Henrietta Klemanski, an ordained minister.

15.     Deny the allegations contained in paragraph 15 as to the proper title for Glenn

Fisher, a former employee of The Salvation Army.

16.     Deny the allegations contained in paragraph 16 as to the proper title for Erin

Padula, a former employee of The Salvation Army.

17.     Deny the allegations contained in paragraph 17 as to the proper title for Leon

Linnen, a former employee of The Salvation Army.

18.     Deny the allegations contained in paragraph 18 as to the proper title for Rodney

Williams, a former employee of The Salvation Army.

19.     Deny the allegations contained in paragraph 19.

20.     Deny the allegations contained in paragraph 20 in that the individual defendants

were not "employers" and admit that The Salvation Army was an employer.

21.     Deny the allegations contained in paragraph 21 and deny that the term created by

plaintiff is accurate. Rose, Hodgson, Klemanski and Fisher were not all "SA Executive

Personnel" and the plaintiff has incorrectly classified them and then repeated this incorrect

3

classification throughout almost every paragraph of the complaint, making almost every paragraph of the complaint incorrect.

22.     Deny the allegations contained in paragraph 22 and deny that the term created by plaintiff is accurate. Padula, Linnen and Williams were not plaintiff's "Supervisors" and the plaintiff has incorrectly classified them as such and then repeated that incorrect classification throughout almost every paragraph of the complaint, making almost every paragraph of the complaint incorrect.

## PROCEDURAL HISTORY

23.     Deny knowledge or information to form a belief as to the truth or falsity of the allegations set forth in paragraph 23, in that defendants do not know the date plaintiff completed an "intake questionnaire" with the EEOC and/or what allegations were included in the document.

24.     Deny knowledge or information to form a belief as to the truth or falsity of the allegations set forth in paragraph 24, in defendants do not know the date plaintiff filed a charge with EEOC and/or what allegations were included in the document.  Defendants admit that a "Notice of Charge of Discrimination" was issued February 13, 2007 alleging "Disability" and "Retaliation."

25.     Deny the allegations contained in paragraph 25; however, admit that the EEOC issued a Determination finding sufficient evidence to warrant a hearing regarding discrimination under the ADA and finding no evidence to warrant a hearing regarding retaliation.

26.     Deny the allegations of paragraph 26 in that the EEOC abandoned its efforts to conciliate after defendant The Salvation Army made a counter proposal.

27.     Deny the allegations of paragraph 27 in that the January 13, 2009 Notice of Right to Sue contains no finding of reasonable cause nor does it say anything about retaliation, disperate treatment or hostile work environment.  The claims before the EEOC were "Disability" and "Retaliation."

28.     Deny the allegations of paragraph 28 in that it appears that the complaint was

filed on April 14, 2009, ninety-one days after the Notice of Right to Sue was issued.

29.     Deny knowledge or information to form a belief as to the truth or falsity of the allegations contained in paragraph 29.

## FACTUAL ALLEGATIONS

1.     **Background**:

30.     Deny knowledge or information to form a belief as to the truth or falsity of the allegations contained in paragraph 30 but believe that "AIDS since 1991" will be unsupported by medical records.

31.     Deny knowledge or information to form a belief as to the truth or falsity of the allegations contained in paragraph 31 which allege that plaintiff is a "qualified individual" under federal, statement and city law.

32.     Deny the allegations contained in paragraph 32 as to whether plaintiff was substantially limited in one or more major life activities.

33.     Deny knowledge or information to form a belief as to the truth or falsity of the allegations contained in paragraph 33 regarding plaintiff's inability to marry and have children.

34.     Deny the allegations contained in paragraph 34 in that one of the "essential functions of his job" was his presence and plaintiff abandoned his shift on more than one occasion.

35.     Deny the allegations contained in paragraph 35 in that defendants were unaware that plaintiff had any disability; defendants had no knowledge and/or perception of plaintiff's sexual orientation as alleged ("homosexual").

36.     Deny the allegations contained in paragraph 36 and state that if plaintiff does in fact have AIDS such condition is the cause of his "extreme emotional, mental, physical and economic distress."

37.     Regarding paragraph 37, admit that The Salvation Army hired plaintiff on or about October 18, 2001 as a "Child Care Worker I."

38.     Deny the allegations contained in paragraph 38 wherein plaintiff alleges he "performed his job well–without any write ups or warnings–..." in that plaintiff did receive at least 11 write-ups and warnings, as follows: (1) November 9, 2002 (Ms. Longmire reported plaintiff to Mrs. Williams (cc Linnen)); (2) January 9, 2003 (plaintiff's supervisor Dierdre Z created and delivered to plaintiff a Disciplinary Warning Notice); (3) December 5, 2003 (plaintiff's supervisor Crystal D created and delivered to plaintiff a Disciplinary Warning Notice; (4) February, 13, 2004 (plaintiff's supervisor L Lennon (cc Williams) issued a deficiency in performance memo to plaintiff); (5) April 14, 2004, (plaintiff's supervisor L Lennon created and delivered to plaintiff a Disciplinary Warning Notice); (6) March 17, 2006, (plaintiff received a written warning after he scheduled insufficient adult coverage at the Residence for six hours); (7) May 16, 2006 (plaintiff received a second written warning for failing to maintain appropriate adult coverage at the Residence); (8) July 10, 2006 (plaintiff received another warning after he falsified boys' names on an allowance distribution sheet) (9) November 15, 2006 (plaintiff received a final written warning for two related incidents where he scheduled medical appointments during his shifts and then failed to notify his supervisors); (10) December 1, 2006 (plaintiff lost $345 in petty cash); (11)  December 20, 2006 (plaintiff was terminated because he abandoned his shift; a detailed account of the evening was written by witness Erin Padula; Ms. Padula is a Social Worker Supervisor at the Residence. Padula observed that plaintiff was in a bad mood and was yelling at the boys in the Residence.  Concerned about plaintiff's angry and hostile behavior, Padula asked to speak to him alone and he told her he did not want to work due to personal problems.  (Plaintiff did not mention any health problems or appear to be sick.) Plaintiff was told he could not leave the Residence early.  Plaintiff left the Group Home two hours early.  He did not call Mr. Linnen; instead, plaintiff left the Residence with no supervisor on duty.  Padula did not give plaintiff permission to leave early). Deny that plaintiff was promoted to "Assistant Facility Supervisor."  Admit that plaintiff requested the position of "Unit Supervisor" in 2004.

39.     Deny the allegations of paragraph 39 and state affirmatively that plaintiff was

terminated because he abandoned his shift and left high risk teenagers unsupervised after being told he could not leave the group home. Defendants were unaware of plaintiff's "disability" and/or "sexual orientation."

40.     Deny the allegations contained in paragraph 40; however, admit that Deborah Rose, John Hodgson, Henrietta Klemanski and Glenn Fisher were present; admit that Rose and Fisher were employed by The Salvation Army and admit that Hodgson and Klemanski are ordained ministers of The Salvation Army (a religion).

41.     Deny the allegations contained in paragraph 41 in that Padula had no supervisory relationship to plaintiff. Padula supervised the Social Workers.

42.     Deny knowledge or information regarding the truth or falsity of the allegations contained in paragraph 42. Defendants are unaware of any "feminine clothing" worn by plaintiff and none of the defendants asked plaintiff if he was "sweet or in other words gay."

43.     Deny knowledge or information regarding the truth or falsity of the allegations contained in paragraph 43. Defendants are unaware of any comments about plaintiff being "soft" or a "punk."

44.     Deny knowledge or information regarding the truth or falsity of the allegations contained in paragraph 44. Defendants are unaware of plaintiff being "insulted" or "challenged in front of the other staff" or of any comments about plaintiff being "soft or in other words gay."

45.     Deny knowledge or information regarding the truth or falsity of the allegations contained in paragraph 45. Defendants have no knowledge of plaintiff being "isolated..from the other employees and group home residents."

46.     Deny the allegations contained in paragraph 46 in that plaintiff was not harassed for taking medically necessary sick days by his supervisor. Defendants are unaware of any harassment of plaintiff "for taking medically necessary sick days." To ensure and/or facilitate proper staffing of the Residence, plaintiff, like all other employees, was required to give as much advance notice as possible of prescheduled doctor's appointments.

**7**

47.     Deny the allegations of paragraph 47 that Rose, Hodgson, Klemanski and Fisher harassed plaintiff about why he was going to his doctors' appointments and state that "John Doe's Supervisors" and "SA Executive Personnel" has been incorrectly defined.

48.     Deny the allegations of paragraph 48 and state that "Joe Doe's Supervisors" has been incorrectly defined. Defendants deny ever asking plaintiff "what sickness he suffered from" and defendants never heard plaintiff say any alleged "sickness" "was confidential."

49.     Deny the allegations of paragraph 49 and state that "Joe Doe's Supervisors" has been incorrectly defined. Defendants did not search plaintiff's desk and defendants did not find "a list of AIDS related medications."

50.     Deny the allegations of paragraph 50; deny that defendants ever discovered that plaintiff "suffered from AIDS" and state affirmatively that the defendants did not know that plaintiff "suffered from AIDS." "John Doe's Supervisors" has been incorrectly defined.

51.     Deny the allegations of paragraph 51 and state that "Joe Doe's Supervisors" has been incorrectly defined. Defendants made no "discriminatory comments about getting his sick ass out of the East Village Resident no matter what it took"

52.     Deny the allegations of paragraph 52 and state that "John Doe Supervisors" has been incorrectly defined. Defendants affirmatively state that defendants did not know or believe that plaintiff was "homosexual" as alleged. Defendants did not make "repeated harassing and discriminatory comments that" plaintiff "became infected with AIDS from homosexual intercourse."

53.     Deny the allegations of paragraph 53 and state that "Joe Doe's Supervisors" has been incorrectly defined. Defendants affirmatively state that defendants did not know that plaintiff "suffered from AIDS." Defendants did not disclose "to staff and residents of the group home that" plaintiff "suffered from AIDS."

54.     Deny the allegations of paragraph 54 and state that "Joe Doe's Supervisors" has been incorrectly defined. Defendants affirmatively state that defendants did not know that

plaintiff "suffered from AIDS." Defendants did not call plaintiff "Doctor's Note (plaintiff)," or state that the "sick man was coming," or state that "AIDS was from the devil." Defendants did not shout "various other offensive remarks at" plaintiff.

55. Deny the allegations of paragraph 55 and state that "Joe Doe's Supervisors" has been incorrectly defined. Defendants affirmatively state that defendants did not know that plaintiff "suffered from AIDS." Defendants did not tell "employees to be careful around" plaintiff "because he was sick and contagious."

56. Deny the allegations of paragraph 56 and state that "Joe Doe's Supervisors" has been incorrectly defined. Defendants affirmatively state that defendants did not know that plaintiff "suffered from AIDS." Defendants took no actions to humiliate, embarrass or cause discomfort or emotional pain to plaintiff in the workplace.

57. Deny the allegations of paragraph 57 and state that "Joe Doe's Supervisors" has been incorrectly defined. Defendants affirmatively state that defendants did not know that plaintiff "suffered from AIDS." Defendants took no actions to humiliate, embarrass or cause discomfort or emotional pain to plaintiff in plaintiff's personal life.

58. Deny the allegations of paragraph 58 and state that "Joe Doe's Supervisors" has been incorrectly defined. Defendants affirmatively state that defendants did not know that plaintiff "suffered from AIDS." Defendant did not disclose plaintiff's condition and contributed in no way to plaintiff's "unbearable social isolation."

59. Deny the allegations of paragraph 59 and state that "Joe Doe's Supervisors" has been incorrectly defined. Defendants did not "repeatedly question employees" about plaintiff's performance and behavior or prompt "them to answer that it was in some way improper or below standard."

60. Deny the allegations of paragraph 60 and state that plaintiff was not "improperly disciplined because he requested and took sick leave." Defendants state there was no "pretext" and that plaintiff was disciplined for legitimate unsatisfactory job performance.

61.     Deny the allegations of paragraph 61 and state that plaintiff was not "improperly disciplined or reprimanded for taking time off due to doctor's appointments." Defendants state that plaintiff was disciplined for giving one hour's notice of his intent to leave work for prescheduled appointments because he was required to give as much notice as possible to ensure and facilitate proper coverage in his absence. It was difficult to cover a shift in the middle of the shift with one hour's notice. Plaintiff was required to give as much notice as possible and plaintiff failed to do so. Plaintiff was aware of his doctor's appointment well in advance and he waited until one hour before the doctor's appointment to tell his employer that he had to leave and would require another staff to come on duty and cover the remainder of his shift.

62.     Deny the allegations of paragraph 62. "SA Executives" has been incorrectly defined as well.

63.     Deny the allegations of paragraph 63; deny knowledge of any disability; deny that sick notes were requested of plaintiff "beyond what was required" by policy and/or by other employees. "John Doe Supervisors" and "SA Executive Personnel" have been incorrectly defined.

64.     Deny the allegations of paragraph 64 in that "John Doe Supervisors" and/or "SA Executive Personnel" did not require plaintiff to give them a schedule of doctors' appointments and affirmative state, plaintiff, like all employees was required to tell his supervisor with as much advance notice as possible when he had a doctor's appointment. Plaintiff could not tell his supervisor at 12 noon that he had a 1pm doctor's appointment because that created a staff coverage problem, particularly when he knew at least a day in advance that he had a doctor's appointment. "John Doe Supervisors" and/or "SA Executive Personnel"are incorrectly defined.

65.     Deny the allegations of paragraph 65 in that plaintiff was allowed on a few occasions to leave work when he stated he was sick. Plaintiff did not tell the defendants he was sick on December 20 nor did plaintiff appear to be sick on December 20. "John Doe Supervisors" is incorrectly defined.

66.     Deny the allegations of paragraph 66. Defendants did not know that plaintiff

10

had "mood and emotional disorders." Defendants did not engage in any conduct to aggravate plaintiff's "mood and emotional disorders." Defendants were unaware that plaintiff's "physical condition markedly worsened" and it was not apparent from looking at plaintiff.

67.    Deny the allegations of paragraph 67. "John Doe Supervisors" and "SA Executive Personnel" are incorrectly defined. Defendants are unaware of any discipline plaintiff received for "tasks that were not his responsibility." Defendants state there was no "pretext" and that plaintiff was disciplined for legitimate unsatisfactory job performance.

68.    Deny the allegations of paragraph 68. As the Unit Supervisor on duty, plaintiff could not abandon his shift with inadequate staff coverage nor could he cause a staff shortage by leaving the premises after being told he had to remain on duty and complete his shift to ensure proper staff coverage. Plaintiff had received a prior warning about the same conduct.

69.    Deny the allegations of paragraph 69 and state there was no harassment, there was no change in the working conditions of plaintiff, and there was no hostile work environment. On December 20, plaintiff was hostile, yelling at the residence and being loud and agitated at his co-worker, Padula.

70.    Deny the allegations of paragraph 70. Defendants were unaware of any "embarrassment, discomfort, and isolation" suffered by plaintiff. Defendants did not engage in any "discriminatory treatment."

71.    Deny the allegations of paragraph 71. Deny that plaintiff ever disclosed to defendants that he had AIDS. Defendants did not know that plaintiff "suffered from AIDS." Defendants did not disclose to anyone that plaintiff "suffered from AIDS." On December 20, 2006, plaintiff was unprofessional, and demonstrated an "irritable mood" at work and was disrespectful to the residents as well as Padula. Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of certain allegations in paragraph 71, particularly defendants are unaware of any "insomnia," "decrease in motivation and energy," "social isolation" and/or "withdrawal."

11

72.     Deny the allegations of paragraph 72. Defendants were unaware of any discrimination and/or harassment and plaintiff never reported discrimination and/or harassment to defendant/s.

73.     Deny the allegations of paragraph 73. "John Doe Supervisors" and "SA Executive Personnel" are incorrectly defined. Defendants disciplined plaintiff when he failed to follow the rules of conduct. Defendants did not know that plaintiff has AIDS and defendants were unaware of his sexual orientation. Defendant never filed a discrimination and/or retaliation grievance. Defendants were unaware of any claims of discrimination and/or retaliation. Defendants disciplined plaintiff for legitimate unsatisfactory job performance.

74.     Deny the allegations of paragraph 74. Plaintiff did not make any reports of discrimination and/or harassment and/or retaliation to the Human Resources Department. The Human Resources Department was unaware of any complaints made by plaintiff. HR was unaware that plaintiff had AIDS and/or was unaware of his sexual orientation or any issues related thereto. Plaintiff's use of "SA Executive Personnel" is incorrectly defined in this entire Complaint.

75.     Deny the allegations of paragraph 75. Defendants are unaware of any complaints made by plaintiff "higher up the chain of command, to the highest SA Executive Personnel." At all levels in the "chain of command" defendants were unaware that plaintiff had AIDS and were unaware of his sexual orientation. Defendants were unaware of any complaints made by plaintiff of discrimination and/or harassment and/or retaliation.

76.     Deny the allegations of paragraph 76. Prior to his termination, plaintiff never complained of discrimination or harassment or retaliation and plaintiff did so for the first time at the EEOC. Plaintiff never told defendant he had any form of disability. Plaintiff never told defendant that he had any sexual orientation issues with co-workers and/or supervisors and/or executives and/or administrators.

77.     Deny the allegations of paragraph 77. Defendants were never aware of any

disability and/or sexual orientation claims and/or discrimination claims; Plaintiff never filed a grievance regarding disability and/or sexual orientation and/or any form of discrimination. And no grievance hearings were ever held regarding discrimination and/or sexual orientation discrimination. Defendants were unaware of any claims and did not retaliate against plaintiff

78.     Deny the allegations of paragraph 78. Defendants are unaware of any physical threats or conversation between plaintiff and supervisors wherein plaintiff was allegedly invited to "take...disagreements outside." "John Doe Supervisors" is incorrectly defined.

79.     Deny the allegations of paragraph 79. Plaintiff was not "Assistant Facility Supervisor."

80.     Deny the allegations of paragraph 80." "John Doe supervisors" is incorrectly defined. Plaintiff was not "Assistant Facility Supervisor."

81.     Deny the allegations of paragraph 81. Plaintiff sometimes forgot to sign his time sheets and when that happened and the supervisor noticed, his supervisor would sign the time sheet for him so that plaintiff would be paid timely. "John Doe Supervisors" is incorrectly defined.

82.     Deny the allegations of paragraph 82. Plaintiff never made any complaints of discrimination and the defendants were unaware that plaintiff "suffered from AIDS. " "John Doe supervisors" is incorrectly defined. Defendant never had "good and excellent" performance evaluations. Plaintiff's performance evaluations were "marginal."

83.     Deny the allegations of paragraph 83. John Doe supervisors" is incorrectly defined. " Defendants state there was no "pretext" and that plaintiff was disciplined for legitimate unsatisfactory job performance. Plaintiff was never "threatened" with "termination or transfer for no cause."

84.     Deny the allegations of paragraph 84. "John Doe supervisors" is incorrectly defined. Defendants did not continually change plaintiff's "work schedule without prior notification." Plaintiff was a Unit Supervisor and as such was required to "attend to the duties

and responsibilities necessary to the operation of the residence" Plaintiff was responsible for "overall supervision of all adolescents in placement," "reports and handles emergencies which may eventuate."... Plaintiff was an exempt employee and as such responsible, in part, for the Residence.

85.     Deny the allegations of paragraph 85. Defendants did not know that plaintiff "suffered from AIDS." Defendants were unaware of plaintiff's "sexual orientation." Plaintiff was terminated for a legitimate business reason after he abandoned his shift, leaving the Residence without proper supervision. Plaintiff had abandoned his shift on a prior occasion and had been warned and written up for that conduct. Defendants were unaware that plaintiff was "sick" as alleged and plaintiff did not tell anyone and or exhibit any conduct or symptoms that would lead anyone to conclude that he was sick on December 20. Plaintiff was agitated, unprofessional and angry; he lashed out at the Residents and it was not until he was questioned about his unprofessional conduct that he asked to go home stating that he was behaving so badly because his friend had died. Plaintiff asked Linnen if he could go home but because there would not be proper staff coverage at the group home if he left, Mr. Linnen denied his request to go home early and told him he had to complete his shift. Plaintiff disregarded Linnen's decision and abandoned his shift two hours early.

86.     Deny the allegations of paragraph 86. Defendants are unaware of plaintiff's diagnosis of "a variety of serious psychological and emotional illnesses." Any symptoms and/or diagnoses suffered/received by plaintiff were not caused by defendants.

87.     Deny the allegations of paragraph 87. Defendants are unaware of any symptoms the plaintiff allegedly suffers, including but not limited to being "totally disabled." Any symptoms suffered by plaintiff were not caused by defendants.

88.     Deny the allegations of paragraph 88. Defendants are unaware that plaintiff was immobilized; lacked motivation; experienced interference with daily functioning and/or became paranoid. Any symptoms suffered by plaintiff were not caused by defendants.

89.     Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 89.

## FEDERAL LAW CLAIMS

### FIRST COUNT

(Discrimination/ADA)

90.     In response to paragraph 90, defendants repeat and reallege the responses previously given regarding allegations in paragraphs 1-89.

91.     Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity regarding the allegations contained in paragraph 91.

92.     Defendants admit the allegations contained in paragraph 93 but state there was no discrimination in this case and that defendants were unaware of any disability.

93.     Defendants deny the allegations contained in paragraphs 92, 94 and 95.

### SECOND COUNT

(Harassment/Hostile Work Environment/ADA)

94.     In response to paragraph 96, defendants repeat and reallege the responses previously given regarding allegations in paragraphs 1-89.

95.     Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity regarding the allegations contained in paragraph 97.

96.     Defendants deny the allegations contained in paragraphs 98, 99 and 100.

### THIRD COUNT

(Retaliation/ADA)

97      In response to paragraph 101, defendants repeat and reallege the responses previously given regarding allegations in paragraphs 1-89.

98.     Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity regarding the allegations contained in paragraph 102.

99.     Defendants deny the allegations contained in paragraphs 103, 104, 105 and 106.

## FOURTH COUNT

### (Improper Medical Inquiries/ADA)

100.    In response to paragraph 107, defendants repeat and reallege the responses previously given regarding allegations in paragraphs 1-89.

101.    Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity regarding the allegations contained in paragraph 108.

102.    Defendants deny the allegations contained in paragraphs 109,  110 and 111.

## STATE LAW CLAIMS

## FIFTH COUNT

### (Discrimination/Disability/State Law)

103.    In response to paragraph 112, defendants repeat and reallege the responses previously given regarding allegations in paragraphs 1-89.

104.    Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity regarding the allegations contained in paragraph 113.

105.    Defendants deny the allegations contained in paragraphs 114, 115 and 116.

## SIXTH COUNT

### (Harassment/Disability/State Law)

106.    In response to paragraph 117, defendants repeat and reallege the responses previously given regarding allegations in paragraphs 1-89.

107.    Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity regarding the allegations contained in paragraph 118.

108.    Defendants deny the allegations contained in paragraphs 119, 120 and 121.

## SEVENTH COUNT

### (Retaliation/Disability/State Law)

109.    In response to paragraph 122, defendants repeat and reallege the responses

16

previously given regarding allegations in paragraphs 1-89.

110. Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity regarding the allegations contained in paragraph 123.

111. Defendants deny the allegations contained in paragraphs 124, 125, 126 and 127.

## EIGHTH COUNT

(Discrimination/Sexual Orientation/State Law/SONDA)

112. In response to paragraph 128, defendants repeat and reallege the responses previously given regarding allegations in paragraphs 1-89.

113 Defendants do not understand the allegations contained in paragraph 130 as to why this allegation is included in the sexual orientation claim.

114. Defendants deny the allegations contained in paragraphs 129, 130, 131 and 132.

## NINTH COUNT

(Harassment/Sexual Orientation/State Law/SONDA)

115. In response to paragraph 133, defendants repeat and reallege the responses previously given regarding allegations in paragraphs 1-89.

116. Defendants do not understand the allegations contained in paragraph 135 as to why this allegation is included in the sexual orientation claim.

117. Defendants deny the allegations contained in paragraphs 134, 135, 136 and 137.

## TENTH COUNT

(Retaliation/Sexual Orientation/State Law/SONDA)

118. In response to paragraph 138, defendants repeat and reallege the responses previously given regarding allegations in paragraphs 1-89.

119. Defendants do not understand the allegations contained in paragraph 140 as to why this allegation is included in the sexual orientation claim.

120. Defendants deny the allegations contained in paragraphs 139, 140, 141, 142 and

143.

## CITY LAW CLAIMS

## ELEVENTH COUNT

(Discrimination/Disability/City Law)

121     In response to paragraph 144, defendants repeat and reallege the responses previously given regarding allegations in paragraphs 1-89.

122.     Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity regarding the allegations contained in paragraph 145.

123.     Defendants deny the allegations contained in paragraphs 146, 147 and 148.

## TWELFTH COUNT

(Harassment/Disability/City Law)

124     In response to paragraph 149, defendants repeat and reallege the responses previously given regarding allegations in paragraphs 1-89.

125.     Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity regarding the allegations contained in paragraph 150.

126.     Defendants deny the allegations contained in paragraphs 151, 152 and 153.

## THIRTEENTH COUNT

(Retaliation/Disability/City Law)

127.     In response to paragraph 154, defendants repeat and reallege the responses previously given regarding allegations in paragraphs 1-89.

128.     Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity regarding the allegations contained in paragraph 155.

129.     Defendants deny the allegations contained in paragraphs 156, 157 and 158.

## FOURTEENTH COUNT

(Discrimination/Sexual Orientation/City Law)

130.     In response to paragraph 159, defendants repeat and reallege the responses

previously given regarding allegations in paragraphs 1-89.

131.    Defendants do not understand the allegations contained in paragraph 160 as to why this allegation is included in the sexual orientation claim.

132.    Defendants deny the allegations contained in paragraphs 160, 161 and 162.

### FIFTEENTH COUNT

### (Harassment/Sexual Orientation/City Law)

133.    In response to paragraph 163, defendants repeat and reallege the responses previously given regarding allegations in paragraphs 1-89.

134    Defendants do not understand the allegations contained in paragraph 165 as to why this allegation is included in the sexual orientation claim.

135.    Defendants deny the allegations contained in paragraphs 164, 165, 166 and 167.

### SIXTEENTH COUNT

### (Retaliation/Sexual Orientation/City Law)

136    In response to paragraph 168, defendants repeat and reallege the responses previously given regarding allegations in paragraphs 1-89.

137.    Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity regarding the allegations contained in paragraph 169. Defendants do not understand the allegations contained in paragraph 170 as to why this allegation is included in the sexual orientation claim.

138.    Defendants deny the allegations contained in paragraphs 170, 171 and 172.

### FIRST AFFIRMATIVE DEFENSE

139.    The EEOC Notice of Charge of Discrimination dated February 13, 2007 and the Charge dated January 8, 2007 both allege discrimination based on "disability" and "retaliation." Plaintiff's claims are time barred, either in whole or in part, to the extent that plaintiff has failed to exhaust all necessary administrative remedies or procedures regarding such claims, and has not included such facts and claims in administrative charges filed regarding the incidents alleged in

the Complaint and to the extent that plaintiff failed to file a claim at the DHR and/or include such claims in his EEOC charges, all of the factual allegations, not included in the EEOC Charge, are time-barred by the statute of limitations as well as plaintiff's failure to exhaust his administrative remedies and/or administrative prerequisite or condition precedent regarding the commencement of his action.

140.   Many of the factual allegations in the complaint are time-barred. The EEOC Charge was filed on January 9, 2007. Title VII requires a claimant to file a charge of discrimination with the EEOC within180 days of the alleged unlawful employment action or, if the claimant has already filed the charge with a state or local equal employment agency, within 300 days of the alleged discriminatory action. See *42 USC 2000e-5(e)*. *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322 (2d Cir. 1999); *VanZant v. KLM Royal Dutch Airlines*, 80 F.2d 708 (2d Cir. 1996). The statutory requirement acts as a statute of limitations and when a charge is not filed timely with the EEOC, the claim is time-barred. See *Butts v. City of New York Dept. of Housing*, 990 F.2d 1397, 1401 (2d Cir. 1993). Plaintiff did not file a charge with NYS Division of Human Rights prior to January 9, 2007.

141.   Accordingly, all factual allegations regarding conduct occurring before July 14, 2006 is time-barred.

142.   The defendants did not know or perceive that plaintiff "suffered from AIDS," as alleged for the first time in his federal court complaint.

143.   The plaintiff did not allege that he "suffered from AIDS" in his EEOC complaint and those allegations are therefore time barred and should be stricken as unduly prejudicial in this complaint.

144.   The defendants did not perceive that plaintiff was "homosexual" as alleged in his federal court complaint.

145.   The plaintiff did not allege that defendants perceived he was "homosexual" in his EEOC complaint and those allegations are therefore time barred.

20

146.    All legal claims not asserted at the EEOC are time barred, including but not limited to the Second Count (Harrasment/hostile work environment/ADA); Fourth Count (improper medical inquiries); Sixth Count (Harassment/Disability); Eighth Count (discrimination based on perceived sexual orientation); Ninth Count (harassment based on perceived sexual orientation); Tenth County (retaliation based on perceived sexual orientation); Twelfth Count (Harassment/ Disability); Fourteenth Count (discrimination based on perceived sexual orientation); Fifteenth Count (Harassment based on perceived sexual orientation); Sixteenth Count (Retaliation based on perceived sexual orientation).

## SECOND AFFIRMATIVE DEFENSE

147.    Any and all conduct affecting plaintiff's employment of which plaintiff complains against defendants and which is attributable to defendants, was a just and proper exercise of management discretion on the part of defendants undertaken for a fair and honest reason and regulated by good faith under the circumstances then existing.

148.    Plaintiff received the Employee Manual.  Plaintiff abandoned his shift when his supervisor told him he could not leave work.  Plaintiff violated the Rules of Conduct.  Plaintiff was written up on several occasions and was aware of the expectations of his employer.  Plaintiff had been written up for abandoning his shift in the past.

149.    Plaintiff's job performance must be satisfactory.  McDonnell Douglas, 411 US at 802-804.  Plaintiff's work performance was unsatisfactory.  Plaintiff received numerous write ups and warning notices, including, but not limited to:

(a)    On November 9, 2002, Ms. Longmire reported plaintiff to Mrs. Williams (cc Linnen) stating that plaintiff "abruptly entered the room swung (resident) out of the chair, and threatened (resident) out of the day-room.  Threatening statements such as sending (resident) back to a mental institution were used....no need for such an aggressive approach...allowed the guest to see improper TCI training...a child should never be threatened to be sent to a hospital, our guest should have never heard that information...it is confidential...the situation could have been avoided, we would not want a child to be falsely sent back to a mental institution."

(b)    On January 9, 2003, plaintiff's supervisor Dierdre Z created and delivered to plaintiff a Disciplinary Warning Notice for failure to attend a mandatory childcare

development training session on 1/8/03 (rec'd previous warning)

( c)    On December 5, 2003, plaintiff's supervisor Crystal D created and delivered to plaintiff a Disciplinary Warning Notice for failure to ensure that a resident attended an urgent appointment.

(d)     On February, 13, 2004, plaintiff's supervisor L Lennon (cc Williams) issued a deficiency in performance memo to plaintiff stating he had been tardy seven times in the past thirty days.

(e)     On April 14, 2004, plaintiff's supervisor L Lennon created and delivered to plaintiff a Disciplinary Warning Notice for failure to attend mandatory staff development training (numerous prior warnings) "he cannot service our youth if he does not have the proper training."

(f)     On March 17, 2006, plaintiff received a written warning after he scheduled insufficient adult coverage at the Residence for six hours. This insufficient adult supervision left the Residence unsafe and unsecured. Plaintiff was reminded that it was important for the Residence to have proper staffing at all times.

(g)     On May 16, 2006, plaintiff received a second written warning for failing to maintain appropriate adult coverage at the Residence. At this time the Residence was already short staffed and careful staffing was critical. Plaintiff did not properly schedule staff for Saturday, May 13th. Then, on May 16th plaintiff himself left the Residence during his shift without notifying his supervisor. On the written warning form, plaintiff admitted his scheduling failure, but argued that it was not his fault. In his EEOC Complaint, plaintiff argued that the warning was unfair because he had accidentally defecated on himself. But, it is uncontested that he left the Residence without proper supervision and without notifying his supervisor. At that time, plaintiff was specifically advised by Mr Linnen that he could never leave the Residence uncovered without notifying Mr. Linnen.

(h)     On July 10, 2006, plaintiff received another warning after he falsified boys' names on an allowance distribution sheet. (This left the Residence open to complaints by the boys that they had not, in fact, received their allowance.) On the warning form, plaintiff again objected, stating both that he never did sign for the boys and that he had been instructed to do so by a previous supervisor.

(i)     On November 15, 2006, plaintiff received a final written warning for two related incidents where he scheduled medical appointments during his shifts and then failed to notify his supervisors. On November 7th, plaintiff gave his supervisors less than one hour's notice that he needed to leave for a medical appointment. On November 14th, plaintiff called to give only a few hours notice that he would be late due to a scheduled medical appointment. On the warning form, plaintiff threatened to file a grievance in response to this warning. In his EEOC complaint, Plaintiff admitted that he knew about these appointments a day before he notified his supervisors.

(j)     On December 1, 2006, plaintiff lost $345 in petty cash. In his EEOC complaint, plaintiff says he left the money under his supervisor's door where residents could search for it with clothes hangers. However, in the loss report plaintiff wrote at the time, he admitted he dropped the money envelope next to a computer and

forgot about it for various reasons.  He later realized it was missing, and he concluded that "I realize I'm responsible for the lost funds...."

(k)     Finally, on December 20, 2006, Plaintiff again deserted his shift.  A detailed account of the evening was written by witness Erin Padula; Ms. Padula is a Social Worker Supervisor at the Residence.  Padula observed that plaintiff was in a bad mood and was yelling at the boys in the Residence.  Concerned about plaintiff's angry and hostile behavior, Padula asked to speak to him alone and he told her he did not want to work because his friend died.  (Plaintiff did not mention any health problems or appear to be sick.)  Plaintiff was told by Linnen that he could not leave the Residence early.  Plaintiff left the Group Home two hours early.  He did not call Mr. Linnen back; instead, plaintiff left the Residence with no supervisor on duty.  Padula did not give plaintiff permission to leave early.

150.    Plaintiff's performance evaluations were marginal.  Plaintiff's February 7, 2002 performance evaluation was rated on a scale of lowest to highest as follows:   (1) "needs improvement," then (2) " satisfactory," then (3) "good," then (4) "outstanding."  Plaintiff received "satisfactory," which was lower than good and/or outstanding.  On plaintiff's 10/18/04 to 10/18/05 Performance Evaluation, plaintiff received a 2 (marginal) rating, with 1 being "unsatisfactory," 2-3 being "marginal," 4-6 being "commendable," 7-8 being "exceeds standards" and 9 being "exceptional."  From 10/18/05 to 10/18/06, using the same scale, plaintiff received a 3, which was once again marginal.

### THIRD AFFIRMATIVE DEFENSE

151.    An adverse employment decision is defined as "a materially adverse change in the terms or conditions of employment **because of the employer's discriminatory conduct**.  Medwid, 752 F.Supp. 125, 136 (SDNY 1990).

152.    The defendants did not know or perceive that plaintiff "suffered from AIDS," as alleged for the first time in his federal court complaint.

153.    The defendants did not perceive that plaintiff was "homosexual" as alleged for the first time in his federal court complaint.

### FOURTH  AFFIRMATIVE DEFENSE

154.    Any conduct by defendants of which plaintiff complains and which is attributable to defendants, was privileged and defendants were justified in engaging in such conduct.

155.    Plaintiff was not terminated based on his disability and/or sexual orientation. Plaintiff received numerous written warning notices, along with marginal performance evaluations.

156.    Discrimination laws were not intended as a vehicle for judicial review of business decisions. Kephart v. Institute of Gas Technology, 630 F.2d 1217, 1223 (7th Cir. 1980), cert. denied, 450 U.S. 949, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). As stated in Kephart, the question before the Court is not whether The Salvation Army's methods were sound, or whether its dismissal of plaintiff was an error of business judgment.

157.    In Kephart, the Court stated: The question is whether he was discriminated against because of his age. Although an employer may not make unreasonable expectations, and must make the employee aware of just what his expectations are, beyond that the Court will not inquire into the defendant's method of conducting its business. Id., 630 F.2d at 1223. See also Havelick v. Julius Wile Sons & Co., 445 F.Supp. 919, 926 (S.D.N.Y. 1978).

158.    In Havelick, the Court stated: When a defendant employer offers evidence that a plaintiff employee was discharged for cause, the plaintiff has the burden of establishing that "the reason advanced by the defendant, i.e., poor work performance, was merely a pretext for/ a course of conduct prohibited by the Act." [cases omitted]. Only where the "cause" was unlawful may the Court substitute its judgment for that of management. Brennan v. Reynolds & Co., 367 F.Supp. 440 N.D. Ill. 1973). Id., 445 F.Supp. at 926.

159.    No finding of pretext is possible here, as it is undisputed that plaintiff received the Employee Manual.  Plaintiff violated the Rules of Conduct.  Plaintiff was written up on several occasions and was aware of the expectations of his employer.  Plaintiff abandoned his shift when his supervisor told him he could not leave work. Plaintiff had been written up for abandoning his shift in the past.

160.    The Court in Depaoli v. Abbott Laboratories, 140 F.2d 668 (7th Cir. 1998), specifically stated that although it would "look to see if the employer actually requires all

employees in a particular position to perform the allegedly essential functions," it would "not otherwise secondguess the employer's judgment in describing the essential requirements for the job." Presence and proper staffing were certainly required in this high risk facility.

161.    ADA requires the employer to establish that a challenged function is essential. Hamlin v. Township of Flint, 165 F.3d 426 (6th Cir. 1999). An "essential function" of a supervisor's job is to staff the facility and to be present to supervise staff. If he is the staff present with a contract that requires staff presence at all time, such presence is an "essential function" of his job. In Patton v. Dobson Association, 1997 U.S. App LEXIS 9615 (9th Cir 1997) (unpublished) (plaintiff "has offered no evidence that he can perform the essential functions of his position").

162.    "Attendance" itself is an essential function for most jobs. In Javonic v In-Sink-Erator, 201 F.3d 894 (7th Cir 2000), the court noted that "common sense dictates that regular attendance is usually an essential function in most every employment setting; if one is not present, he is usually unable to perform his job."

163.    After plaintiff abandoned his shift twice and left the facility without a supervisor, it was clear that he posed a "direct threat" In analyzing whether someone poses a direct threat, the EEOC and courts have said that employers should consider: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and, (4) the imminence of the potential harm 29 C.F.R. § 1630.2 ( r).

164.    When plaintiff abandoned the facility, his abandonment prevented him from performing essential job functions, namely supervising the high risk teenagers. This posed a direct threat given the documented volatile nature of the teenagers and the number of incidents reported  in the facility. This created a risk of harm to the teenagers and a risk of losing the ACS funding due to failure to follow the mandated staffing requirements. It also created a risk of liability (negligence) for The Salvation Army in the event of an occurrence or harm to one of the unsupervised teenagers.

165.    Mr. Linnen and Mr Williams were plaintiff's supervisors. They accommodated any request to visit doctors plaintiff made, even when plaintiff only told defendants that he had a doctor's appointment one hour before the appointment. Plaintiff's conduct made maintaining proper coverage at the Residence very difficult but plaintiff was always allowed time off when he requested to visit a doctor. The doctor's notes stated plaintiff was seen for treatment of bronchitis, phenomena, head injury and upper GI infection (nausea and diarrhea) and was treated by common cold medicine/antiobiotics.

## FIFTH AFFIRMATIVE DEFENSE

166.    Any action by defendants of which plaintiff complains against defendants, and which is attributable to defendants, was taken with proper justification and carried out in a reasonable manner.

## SIXTH AFFIRMATIVE DEFENSE

167.    Any conduct by defendants of which plaintiff complains against defendants, and which is attributable to defendants, was based on legitimate, nondiscriminatory reasons unrelated to plaintiff's disability (of which defendants were unaware) and/or sexual orientation (of which defendants were unaware).

## SEVENTH AFFIRMATIVE DEFENSE

168.    At all material times, defendant maintained a policy against discrimination which included a procedure which was available to plaintiff for asserting such claims.

169.    Upon hire, Complainant was required to attend an Orientation conducted by The Salvation Army, Human Resources Department at which time he was given an Employee Manual. The Employee Manual, page 2, states:

> About the Salvation Army. . .Mission Statement:...Its ministry is motivated by the love of God. Its mission is to preach the gospel of Jesus Christ to meet human need in His name without discrimination.

170.    The Employee Manual, page 5 informs each employee of their "Equal Employment Opportunity". The Employee Manual, page 8, states:

> Any employee who believes that he or she has been wrongfully discriminated against or harassed on a basis prohibited by law is urged to report the incident. Reported incidents will be investigated on a confidential basis according to the procedures described . . . The Salvation will not tolerate retaliation against any employee who complains . . . or provides information in connection with any such complaint in good faith.

171.    Plaintiff never invoked said procedure or advised defendant of having been subjected to discrimination and/or retaliation of any kind and the first time defendant became aware of plaintiff's discrimination complaint/s was when plaintiff filed his charge/s at the EEOC.   The first time that defendants became aware that plaintiff "suffered from AIDS" and/or believed he was discriminated against based on sexual orientation was when plaintiff filed this Complaint.

172.    Plaintiff failed to exhaust his available internal remedies.

173.    Any discrimination claimant must take all reasonable steps to minimize their harm, including exhausting any internal review procedures.  Plaintiff failed to do so.

### EIGHTH AFFIRMATIVE DEFENSE

174.    Any claim for punitive damages is barred as to any claims for which such relief is not available, including federal, state and city laws.

### NINTH AFFIRMATIVE DEFENSE

175.    Upon information and belief, plaintiff failed to mitigate damages, if any exist, as required under the law; therefore, no relief should be granted.

### TENTH AFFIRMATIVE DEFENSE

176.    Any acts or  omissions to act by defendants were not the proximate cause of any alleged injuries, if any, suffered by plaintiff.

### ELEVENTH  AFFIRMATIVE DEFENSE

177.    The Complaint fails to state a claim upon which relief can be granted.

### TWELFTH  AFFIRMATIVE DEFENSE

178.    The three step analysis for Title VII claims applies equally to ADA claims.

Friedman, 1999 US Dist. LEXIS 10899 at 26027 (SDNY July 20, 1999). The plaintiff's claims cannot withstand the analysis.

179. Plaintiff must prove that (1) he suffered from a disability; (2) he could perform the essential functions of the job with or without reasonable accommodation; (3) he was fired because of his diability (Ryan, 135 F.3d 867, 869 (2d Cir. 1992).

180. Defendants were unaware of any disability and they did not perceive any disability (42 USC 12102(2)(B)(C). Plaintiff never told defendants he had a disability; plaintiff never presented defendants with any "record of such an impairment." Plaintiff never requested an accommodation. Defendants offered to transfer defendant to a different position that did not require the same rigid attendance/availability requirements staffing requirements and plaintiff refused.

181. Plaintiff was not "regarded as having an impairment."

182. In the EEOC Charge (page 1, 5/17/06) plaintiff admits he refused to tell his employer whether he had a disability.

183. In a "record of" case, the plaintiff must "show (his employer) that the impairment for which he was hospitalized (treated) was imposing a substantial limitation on one or more of his major life activities." (Colwell, 158 F.3d 635 (2d cir. 1998).

184. In 2005, plaintiff presented 11 doctor's notes. These medical notes included bronchitis, pneumonia, nausea and diarrhea (upper GI symptoms) and a head injury. They evidence plaintiff was being treated with ibuprofen (typical medications for colds and minor pains) and erythromycin and zithromaz (common antibiotics). In 2005, the maximum absence due to various illeneses was three days; however, all of plaintiff's absences were excused.

185. In 2006, plaintiff submitted 9 doctors notes which ranged once again from nausea and diarrhea (upper GI symptoms) to bronchitis, skin rash, and pneumonia. In 2006, plaintiff was excused from work for 7 days due to bronchitis, and 6 days due to pneumonia. Plaintiff was not hospitalized, to defendants' knowledge, on either occasion and neither bronchitis nor pneumonia can be considered a disability.

186.    Plaintiff was absent at least 23 days from July 7 to December 20, 2006.  As stated in the documents, the absences were accommodated when plaintiff gave proper notice; however, he was in fact written up when he gave 1 hour's notice of a doctor's appointment in the middle of a shift or two hours notice that he would not appear for his shift or when he abandoned the facility on two separate occasions in the middle of his shift leaving the facility unstaffed

187.    The incident resulting in plaintiff's termination had nothing to do with sickness or a request to leave work due to sickness.  On December 20, 2006, plaintiff exhibited no physical signs of sickness; plaintiff did not say he was sick; plaintiff was unprofessional and aggressive with the teenagers in his care; when this conduct was called to his attention by Padula, plaintiff was initially unprofessional and aggressive with Padula.  Plaintiff explained to defendant Padula that he was agitated because his friend had just died.  Plaintiff asked to go home and Padula called his supervisor who said he could not leave his shift because that would leave the group home understaffed.  Plaintiff abandoned his shift despite contrary directions from his supervisor, leaving the "high risk" group home without adequate supervision.  He was terminated because this was the second time he had abandoned his shift and he blatantly disregarded a directive from his supervisor.

## THIRTEENTH AFFIRMATIVE DEFENSE

188.    Lack of knowledge is a defense in a wide variety of ADA cases.  For example, in Rinehimer v. Cemcolift, Inc., 292 F.3d 375 (3d Cir. 2002), the court noted that "to establish discrimination because of a disability, an employer must know of the disability."  In this case, the plaintiff did not even allege that the employer knew about his asthma.

189.    In Wilking v. County of Ramsey, 153 F.3d 869 (8th Cir. 1998), the court stated that knowledge of an individual's disability can be "an essential element of an ADA employment discrimination claim." Importantly, the court held that the employer could use lack of knowledge as a defense even though it learned of the individual's medical condition before her actual discharge (but after the poor job performance, which was the reason for the discharge).

190.    In Casper v. Gunite Corp., 2000 U.S. App. LEXIS 16241 (7th Cir. 2000)(unpublished),

the court noted that "in order to demonstrate that [an employee] was discriminated against because of his disability," he must also provide evidence that the employer "was aware of his disability."

191.     In Linser v. Ohio Department of Mental Health, 2000 U.S. App. LEXIS 25644 (6th Cir. 2000) (unpublished), the court held that the plaintiff could not prove disability discrimination where she presented no evidence that the employer knew of the limitations on her major life activities (e.g., sleeping, sex, and household chores) at the time it made its alleged adverse employment decision.

192.     In Kilivas v. Credit Agricole, 1997 US App LEXIS 27163 (2d Cir. 1997)(unpublished), the court found that where the employer did not know about the employee's depression prior to the termination decision, there was no disability discrimination.

193.     In Potts v. National Healthcare, L.P., 5 AD Cases 1110 (M.D. Tenn. 1996), the court stated that "at the most basic level, it is intuitively clear when viewing the ADA's language in a straightforward manner than an employer cannot fire an employee "because of a disability unless it knows of the disability."

194.     Defendants did not know nor did they perceive that plaintiff had a disability.

### FOURTEENTH AFFIRMATIVE DEFENSE

195.     To establish a prima facie case under the ADA, the claimant must show that (1) he is disabled; (2) he is qualified to perform the essential functions of the employment position with or without reasonable accommodations; and, (3) he suffered an adverse employment action because of the disability.  Plaintiff cannot meet the burden of proof.

196.     In identifying essential job functions under the ADA, the trier of fact considers: (1) purpose of the position; (2) time spent performing the function; (3) work experience of employees; (4) nature of work/employer's organizational structure; (5) specialization of function; (6) consequence of not requiring the function; (7) terms of a collective bargaining agreement (or funding contract); (8) employer's judgments; (9) written job descriptions.

197.     To be qualified under the ADA, an individual must: (1) have the requisite skills,

experience, education, licenses, etc. and (2) be able to perform the essential functions of the job, either with or without a reasonable accommodation 42 USC 12111(8); 29 C.F.R. § 1630.2(m)

198.    Plaintiff's only limitation is that he failed and/or refused to tell his supervisor when he made doctors' appointments. Plaintiff arrived at work and for example at 2pm and told Linnen that he had a 3pm doctor's appointment. Plaintiff called in an hour before his shift began and say he had a doctors' appointment and was not coming.

199.    Plaintiff was a supervisor and as such was directly responsible for the "overall supervision of all adolescents in placement" "supervises and maintenance of daily logs in the residence" (logs that recorded the movements of the teenagers, when they entered the premises, when they left, what they were doing in hourly intervals and where they were located in the house); providing "medical care when necessary" "reports and handles emergencies which may eventuate." Plaintiff knew that the house had to be staffed twenty four hours a day, seven days a week, in accordance with Administration for Children's Services guidelines and the funding contract. Plaintiff knew that the teenage boys in this particular facility were high risk teenagers who required 24/7 supervision.

200.    When Plaintiff failed to give notice of his pre-planned doctors' appointments, he put the teenagers at risk. It is very difficult to re-staff the facility with one or two hour's notice. Plaintiff's only "limitation" was his continuing failure to timely notify his supervisor of his need to visit the doctor.

201.    Plaintiff knew he had pre-scheduled appointments and knew he had appointments and he chose not to tell his supervisor. Further, the doctor's notes all dealt with bronchitis, head injury, upper GI infection and his supervisor did not know that he any "disability."

202.    Plaintiff's presence was an "essential function" of his job. Staffing the facility 24/7 was an "essential function" of the program. As a supervisor, Plaintiff's job duties were to staff the facility in accordance with the funding contract 24 hours a day, seven days a week. Plaintiff not only failed to do so, he also failed to be present during the times he was scheduled to work.

31

203.   As a supervisor, Plaintiff was also on call 24/7 and was required to respond to all calls, appear for emergencies and cover shifts when staff did not report to work. These were all "essential functions" of his job as supervisor.

204.   The majority of Courts have concluded that attendance is an essential function of a job. In Lamb v. Qualex, Inc., 2002 U.S. App. LEXIS 5982 (4th cir. 2002)(unpublished), the court noted that "a regular and reliable level of attendance is an essential function of one's job."

205.   In Janovic v. In-Sink-Erator, 201 F.3d 894 (7th Cir. 2000), the court noted the "common sense dictates that regular attendance is usually an essential function in most every employment setting; if one is not present, he is usually unable to perform his job."

206.   In EEOC v. Yellow Freight System, 253 F.3d 943 (7th Cir. 2001), the Court noted that "attendance at job site is a basic requirement of most jobs," and "the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of disability." Therefore, the employee, who had AIDS-related cancer, was not qualified where he had a history of repeated absences for which he was disciplined on approximately 15 occasions.

207.   In Dudley v. California Department of Transportation, 2000 U.S. App LEXIS 5249 (9th Cir 2000)(unpublished), the Court concluded that regular, consistent attendance was an essential function of the plaintiff's supervisory job. The court found that the employee "failed to demonstrate that she was 'otherwise qualified under the ADA because she did not maintain regular and consistent attendance, nor did she demonstrate that any defined period of leave would have allowed her to control her condition."

208.   In Hollestelle v. Metropolitan Washington Airports Authority, 1998 U.S. App. LEXIS 9420 (4th Cir. 1998)(unpublished), the court held that "attending work on a regular and predictable manner," including "arriving to work on time" is an essential function of almost every job.

209.   In Halperin v. Abacus Technology Corp., 128 F.3d 191 (4th cir. 1997), the court noted that it was "undisputed the [the employee] held a job that required his regular attendance at work." The employee was not qualified in light of the fact that he "was unable to come to work on a regular

basis (i.e., he missed 45 days of work during his last six months on the job).

210.    As reflected in the position statement, page 6 (items 12-20) and the doctor's notes (Exhibit J, Exhibit F and Exhibit H appended thereto), plaintiff was absent at least 23 days from July 7 to December 20, 2006. As stated in the documents, the absences were accommodated when plaintiff gave proper notice; however, he was in fact written up when he gave 1 hour's notice of a doctor's appointment in the middle of a shift or two hours notice that he would not appear for his shift or when he abandoned the facility on two separate occasions in the middle of his shift leaving the facility unstaffed (Position Statement pp 4-5).

211.    In Deal v. Candid Color Systems, 1998 U.S. App. LEXIS 15018 (10th Cir. 1998)(unpublished), the court held that the employer was not required to permit an employee to "work whenever she was able, with little or no notice of her absences."

## FIFTEENTH AFFIRMATIVE DEFENSE

212.    Plaintiff received one Offense and Warning form for failure to timely notify his employer that he had a doctor's appointment (Position Statement, Exh F). Plaintiff received one Record of Offense and Warning for abandoning his position in the middle of a shift (Position Statement, Exh I).

213. In Plaintiff's EEOC Charge, he specifically states that he refused to tell Linnen if he had an illness because that was "confidential." The only indication Linnen had were the doctor's notes which reflected many different short term issues like bronchitis, head injury, upper GI infection. Linnen had no idea Plaintiff "suffered from AIDS" and there is no evidence that the employer ever became aware of a "disability."

214.    The only discipline regarding doctor's appointments in this case relates to plaintiff's refusal to notify Linnen ahead of time that he had doctors' appointments. One hour before the appointment in the middle of one's shift cannot be considered reasonable, particularly in this high risk facility where staff coverage is mandatory to continued funding.

215. An employer may uniformly impose discipline, even if the employee later reveals that

the misconduct was a result of a disability. This a because an employer may hold all employees (those with and without disabilities) to the same performance and conduct standards. See 56 Fed. Reg. 35, 733 (1990); EEOC Compliance Manual § 915.002 at 11, 12 fts. 11 & 12 (3/14/95). EEOC headquarters trains EEOC investigators that reasonable accommodation does not include "waiving warranted discipline, even if disability played a role in causing the conduct that is worthy of discipline." EEOC ADA Case Study Training (1996) C.S.1 at p. 5.

216.   Plaintiff was allowed to attend all doctor's appointments and was permitted at least 23 days of excused absences in his last six months of employment. It was not until he had to leave work in the middle of his shift, giving one hour's notice to go to a doctor's appointment that he knew about before his shift started and at least a day prior, that he was disciplined. It was not until plaintiff left the facility un-staffed for the second time that he was terminated. The incident of termination had nothing to do with a doctor's appointment and/or sickness.

217.   This case falls within the EEOC mandates which would allow the employer to engage in progressive discipline administered to all employees. No employees were allowed to leave mid-shift and leave the facility under-staffed. This left the high risk teenagers unsupervised and violated the funding contract and ACS regulations.

218.   Fisher, Linnen and Williams all recommended that plaintiff transfer out of the high risk facility. Plaintiff admits this several times in his Charge (Charge, page 1-11/11/06; 1/19/06; page 6-10/27/06); however, he refused to transfer, leaving the high risk facility un staffed when he failed to come to work and/or left in the middle shift. Had The Salvation Army known of the disability, transfer would have been a "reasonable accommodation" Haines v. Bethlehem Lukens Plate Steel, 2001 U.S. App. LEXIS 24678 (3d cir. 2001)(unpublished).

## SIXTEENTH AFFIRMATIVE DEFENSE

219.   Under the ADA, plaintiff was a unit supervisor so in the event he had disclosed the need for an accommodation, the nature of his job required him to be available 24/7. He never asked

for a non-supervisory position in a facility with such an opening and he refused all offers to take same. He also refused reinstatement when offered at the EEOC.

220.    All supervisors must be on call to cover emergencies of their staff/teenagers 24/7. Such an accommodation would "fundamentally alter the nature of the operation of the business." This was a high risk facility that must be staffed 24/7.

221.    Plaintiff claims he was offered a transfer in January, 2006 by Linnen, Fisher and Rodney Williams, but Plaintiff admits he refused the offer (Charge, p 1-1/11/06; 1/19/06). In a meeting on January 19, 2006, plaintiff alleged in his Charge that he was offered a transfer by Fisher and Williams and plaintiff refused. Plaintiff claimed in conjunction with the same "no call, no show" incident on January 19, he was told if he did not accept a transfer, he may be terminated.

222.    Plaintiff admitted in his Charge, page 1 (1/19/06), that on May 17, 2006 he abandoned the facility and left the teenagers without coverage. Plaintiff stated that he told Linnen he was sick and Linnen asked him "what was my illness" and "I told him it was confidential." On May 22, 2006, plaintiff states in his Charge that Linnen told him that a supervisor had to be at work all the time and that plaintiff was not going to be a supervisor long if he kept calling out sick, that he was not going to be able to continue as a supervisor if he kept missing work.

223.    Plaintiff admits on June 12, 2006, Linnen told him that Linnen and Fisher were trying to transfer him to another site (Charge, page 3). Plaintiff admits that on October 27, 2006, Linnen discussed a transfer with Plaintiff (Charge, page 6).

224.    Plaintiff admits that on November 11, 2006, he notified his supervisor of a doctor's appointment one hour before the appointment in the middle of his shift, although plaintiff had learned of the appointment the day before (Charge, page 6). Plaintiff states further that he was called to a meeting on 11/30/06 wherein he was told he needed to give one weeks' notice of doctor's appointments. (Charge, page 6). Work schedules are organized weekly and one week's notice is not unreasonable. Obviously, accommodations would be made if one week's notice was not possible, but there is no evidence in the record that one week's notice was impossible or detrimental to his

35

health. The facts in this case evidence one hour's notice in mid-shift or abandonment of the position, and such notice or conduct is unreasonable and is misconduct, particularly in this high risk facility.

225.    Plaintiff admits that he had a confrontation with Padula on December 20, 2006. He alleges he had a conference call with Linnen and Padula, that Linnen told him not to leave the facility and that he left anyway. Plaintiff states that on December 22, 2006, he was aware that Padula told Linnen that she did not give plaintiff permission to leave the facility. (Charge, page 7). Padula testified that plaintiff did not say he was sick; did not appear to be sick; and, said he was being abusive to the teenagers and Padula because his friend had died and that was why he wanted to go home.

## SEVENTEENTH AFFIRMATIVE DEFENSE

226.    Plaintiff claims that Linnen made an isolated discriminatory. Defendants specifically deny that Mr. Linnen made any discriminatory or insensitive remarks to plaintiff. The Courts have held that isolated comments are not dispositive of discrimination (Brown v. Coach Stores, Inc., 163 F3d 706, 713 (1998); Carter v. Cornell Univ., 976 F. Supp 224 (1997) aff'd, 159 F3d 1345 (1998) (six race related disparaging comments over three years did not create a hostile work environment). There must be a steady barrage of opprobrious comments (Forrest, 3 NY3 at 311).

227.    The Salvation Army is currently administering 183 health programs in 39 countries, focusing on healthcare and the prevention of disease. Almost all of these include responses to HIV/AIDS. At a conservative estimate, these programs are now helping between seven and eight million people.

## EIGHTEENTH AFFIRMATIVE DEFENSE

228.    There is only one "Record of Offense and Warning" related to scheduled medical appointments. That Warning clearly states that on November 7, 2006 at 2pm, plaintiff told his supervisor he had to leave for a 3pm doctor's appointment. The Warning clearly states that on November 14 at 11 am plaintiff called to say he would not make the 1pm shift because he had a medical appointment on that very day and thereafter plaintiff did not arrive at work until 6pm. For

these two issues, plaintiff merely received a written warning.

229.   The high risk facility required 24/7 staffing and it was impossible to staff the facility if staff called in at the last minute regarding doctor's appointments.  There was no indication or evidence that plaintiff had an emergency.  It appears that he scheduled two separate doctor's appointments and failed to notify his employer that he needed time off.  As a result, he was on the schedule to cover his shift when he called in at the last minute to say he would not appear.  Operating the high risk facility was difficult with regular staff, when a supervisor began to disregard the need for proper staffing, a warning notice was a legitimate reaction.

230.   Plaintiff's "no call, no show;"(which he admits in the Charge, p. 1), his abandonment of the facility on two separate occasions (Charge, pp. 1, 7); his scheduling of medical appointments with one hour notice to his employer when he was on the schedule to work, all evidence a blatant disregard for the teenagers at the facility.

231.   Every single time plaintiff requested an accommodation to see a doctor that accommodation was granted, even when he failed to give adequate notice or had to abandon his shift in the middle of the shift to go to the doctor.

232.   Plaintiff never once disclosed to his employer that he had any sort of "disability" and even given his statement of the facts, when as was allegedly asked if he had an illness he refused to answer the question(Charge, p. 1, 5/17/06) .  Plaintiff admits that he refused repeated offers to transfer to a lower risk facility.  Ultimately, plaintiff had a confrontation with Padula (facility manager) , which he admits, and then left the facility on December 20, 2006 (the termination event).  There is no mention of illness or a doctor's visit on December 20, 2006.  Plaintiff states in his Charge, page 7, on December 20, 2006,  "I had a confrontation with Erin Padula (facility manager) she asked me what was going on and I told her I was not feeling well and I was sorry about that had happened earlier.  I told Padula that I was really stressed out and I was sick of Linnen calling me before I get to work and screaming at me like I was one of the kids."  "Stressed out" is not a disability and does not warrant leaving the facility in the middle of a shift.  Yet, plaintiff left his shift

two hours early after his supervisor told him he could not leave.

233.    Plaintiff committed substantial misconduct when he, a supervisor, abandoned the facility leaving the teenagers at risk. As a supervisor, he would have been the one called in the event one of his direct reports abandoned the facility. There was no testimony to establish that plaintiff was sick with a "disability" or that Plaintiff even asked Mr. Linnen to come to the facility to cover for Plaintiff, the only supervisor on duty, merely abandoned his job after he was told not to leave. The EEOC's owned mandates, cited above, support discipline in these circumstances.

234.    Plaintiff's conduct placed the high risk teenagers in that facility at risk and left them improperly supervised on more than one occasion

## NINETEENTH AFFIRMATIVE DEFENSE

235.    The individual defendants named in this action are not personally liable for any conduct alleged herein.

236.    Naming the individual defendants in this action given the fact pattern and the absence of witnesses to substantiate plaintiff's claim is frivolous, as defined in Fed R. Civ. P., Rule 11.

237.    The individual defendants in this case bear no liability, based on the factual allegations, and as a matter of law, and as such should be dismissed from this action, with costs and attorney fees reimbursed.

**WHEREFORE,** defendant respectfully requests that this Court:

(1)    dismiss plaintiff's complaint in its entirety;

(2)    award defendant all costs, disbursements and attorney's fees incurred in the defense of this action in accordance with Rule 11; and,

(3)    grant such other and further relief to said defendant as to this Court may seem just, proper, and equitable.

DATED:      May 28, 2009
            New York, New York

                                    TRATNER, MOLLOY & GOODSTEIN, LLP

                            By:     _Cindy E. Molloy_
                                    Cindy E. Molloy [CM 0276]
                                    551 Fifth Avenue
                                    New York, New York  10176
                                    Tel: 212 867 1100
                                    Fax: 212 972 1787
                                    Attorneys for all Defendants

# AFFIDAVIT OF SERVICE BY MAIL
## AND E-FILE AND E-MAIL

STATE OF NEW YORK   )
                     ) ss:
COUNTY OF NEW YORK )

PAULETTE JOHNSON, being duly sworn, deposes and says:

I am not a party to the action, am over 18 years of age and reside at Brooklyn, New York.

On May 28, 2009, I served a true copy of the annexed ANSWER by and mailing same in a sealed, regular envelope requested with postage thereon in a post office or official depository of the U.S. Postal Service within the State of New York, addressed to the last known address of the addressee as indicated below:

Also, On May 28, 2009, I electronically filed a true copy of the annexed ANSWER and also, on May 28, 2009, I served a true copy of the annexed ANSWER by e-mail.

Amy Hong (AH 5683)
The Legal Aid Society
199 Walter Street, Third Floor
New York, New York 10038
Tel:  212 577 3626
Fax: 212 509 8753
amhong@legal-aid.org
Attorney for Plaintiff

David Langloif (DL 2319)
Sutherland Asbill & Brennan LLP
1114 Sixth Avenue, 40th Floor
New York, New York 10036
Tel:  212 389 5000
Fax: 212 389 5099
Davidlangloif@southerland.com
Attorney for Plaintiff

PAULETTE JOHNSON

SWORN TO BEFORE ME THIS
28TH DAY OF MAY, 2009.

NOTARY PUBLIC

CINDY E. MOLLOY
Notary Public, State of New York
No. 02MO4960968
Qualified in New York County
Commission Expires Feb. 22, 2010